IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02721-MEH

SHANNA E. WALLEN,

     Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

     Plaintiff Shanna Wallen appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), originally filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court **reverses** the ALJ's decision and **remands** the matter to the Commissioner for further consideration.

## BACKGROUND

### I.    Procedural History

     Plaintiff seeks judicial review of the Commissioner's decision denying her applications for DIB and SSI benefits filed on May 1, and May 4, 2013 respectively. [Administrative Record

("AR") 308-323]  After the applications were initially denied on November 22, 2013 [AR 169-175], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for March 19, 2015 [AR 215-233], at which Plaintiff was represented by counsel, and the Plaintiff and a vocational expert ("VE") testified.  [AR 78-111]  The ALJ issued a written ruling on April 22, 2015 finding Plaintiff was not disabled starting on December 8, 2012 because considering Plaintiff's age, experience, and residual functional capacity, she could perform jobs existing in significant numbers in the national economy.  [AR 146-163]  After Plaintiff appealed the decision, the SSA Appeals Council remanded the matter to the ALJ saying, ". . . [t]he hearing decision does not identify, discuss, or contain an evaluation of the nontreating source opinion from Dr. David Benson, a psychologist, indicating significant limitations in mental functioning."  [AR 166] Accordingly, the Appeals Council ordered the ALJ on remand to

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p).

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14).  The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 C.F.R 404.1566 and 416.966).  Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

[AR 167]  On remand, the ALJ held another hearing on February 7, 2017 at which the Plaintiff and a VE, Martin Rauer, testified.  [AR 44-77]  Once again, the ALJ issued an unfavorable decision

[AR 11-43], and Plaintiff appealed the decision. On August 27, 2018, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR 1-6]. *See* 20 C.F.R. § 416.1481. Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.     Plaintiff's Alleged Conditions

Plaintiff was born on August 10, 1986; she was 26 years old when she filed her applications for DIB and SSI on May 1 and May 4, 2013. [AR 308] Plaintiff claims she became disabled on December 8, 2012 [*id.*] and reported that she was limited in her ability to work due to post-traumatic stress disorder ("PTSD"); anxiety; bipolar disorder; problems with her right shoulder, right elbow, both wrists, both knees, and both hands; ADHD; and a learning disorder. [AR 373]. On August 22, 2013, Plaintiff filed a "Function Report," in which she explained that she was limited in her ability to work because her illnesses, injuries, and conditions "limit [her] ability to understand[,] comprehend[,] or do the work asked of [her] by employers." [AR 393] She also stated she could walk "a block" before needing to stop and rest for 30-45 minutes before she could resume walking. [AR 398]

Plaintiff's records pertaining to her mental health and her carpal tunnel syndrome are relevant to the issues Plaintiff raised in this appeal. Her remaining medical records concern treatment for conditions that are not at issue in this case.

### A.     Plaintiff's Records of Carpal Tunnel Syndrome

The record indicates on January 25, 2013, Plaintiff presented to St. Mary's complaining of pain in both of her knees, her right elbow, and her right shoulder. [AR 518, 632] On her intake

paperwork Plaintiff indicated she had joint pain in both hands and wrists. [AR 635] She had 5 out of 5 strength with testing of wrist extension and wrist flexion. [AR 632]

Later that year, on October 19, 2013, Carolynn Francavilla-Brown, M.D., examined Plaintiff. [AR 591] She reported Plaintiff described both hands as stiff and painful, with pain in the center of her hands that improves with massages. [AR 592] Plaintiff stated this had been going on for approximately one year. [*Id*.] Dr. Francavilla-Brown also examined radiographs of Plaintiff's right wrist. [AR 590] She found that the examination was "very limited with all three views significantly under-penetrated especially the lateral view." [*Id*.] She identified no fractures, dislocations, or abnormalities based on the "significantly limited study." [*Id*.] Dr. Francavilla-Brown's functional assessment for Plaintiff determined "grasping and handling should be allowed frequently." [AR 596]

On November 29, 2014, Plaintiff presented to the Parkview Internal Medicine ("Parkview") emergency department with bilateral wrist pain. [AR 638] Plaintiff stated "it has been up all" for the last five years and that she was told it was carpal tunnel syndrome. [*Id*.] She described the pain as sharp and burning, radiating up and down both sides of her wrists into her hand and forearms. [*Id*.] Plaintiff was directed to use cockup splints, take ibuprofen, and rest. [AR 689] Two days later, on December 1, 2014, Plaintiff presented to Tanya Hrabal, M.D., at Touchstone Health Care West. [AR 848] Dr. Hrabal assessed Plaintiff, in relevant part, with carpal tunnel syndrome on both sides. [*Id*.] She noted she would order EMG nerve testing and she would refer Plaintiff for a surgical evaluation if the EMG was positive. [*Id*.] She directed Plaintiff to wear splints and take Naprosyn for pain and inflammation. [*Id*.] Plaintiff returned to Dr. Hrabal on December 16, 2014, with a form from her attorney. [AR 843] Dr. Hrabal

4

noted she "[f]illed out form for [Plaintiff's] lawyer stipulating decreased use of her bil[ateral] upper extremities. Also stated that this is not a PERMANENT condition." [*Id*. (emphasis in original)] She cautioned Plaintiff not to miss her upcoming EMG appointment. [*Id*.]

The form Dr. Hrabal completed sought a physician's findings of Plaintiff's residual functioning capacity ("RFC"). [AR 686] On the form Dr. Hrabal stated she was treating Plaintiff for "working bilateral carpal tunnel" and that the maximum amount Plaintiff could lift or carry for up to one-third of an eight-hour day was two pounds. [*Id*.] Dr. Hrabal also indicated the condition restricted Plaintiff's performance of certain activities as follows: on the right, Plaintiff could occasionally perform reaching activities, seldom perform handling activities, and rarely perform fingering activities; on the left, Plaintiff could frequently perform reaching activities, seldom perform handling activities, and rarely perform fingering activities. [*Id*., AR 687] In response to the question "How long have the patient's impairments been at the severity levels listed above?" Dr. Hrabal responded that "per patient nine years." [AR 687] She also noted that Plaintiff was "currently being worked up for carpal tunnel. This is not [a] permanent condition." [*Id*.]

Plaintiff presented to Mallikarjuna Nallegowda, M.D., on December 19, 2014, for a bilateral upper extremity EMG/nerve conduction study to rule out carpal tunnel syndrome. [AR 678, 840] Dr. Nallegowda noted Plaintiff had a history of bilateral hand tingling and numbness in the first three digits for the past nine years, and Plaintiff reported weak hand grip and difficulty opening doors. [AR 678] The EMG/nerve conduction study showed "electrophysiological features consistent with focal median neuropathy 'at' the wrist as is typically seen in Carpal Tunnel Syndrome (CTS). It is **MILD** in degree electrically . . . on Right upper limb. Normal study on left upper limb." [AR 678 (emphasis in original)]

On December 29, 2014, Dr. Hrabal referred Plaintiff to Raymond Lilly, M.D., in Parkview's neurosurgery department. [AR 835] Plaintiff presented to Dr. Lilly on February 12, 2015 for an evaluation of her hand symptoms. [AR 803] Plaintiff complained of pain in her wrist radiating up her forearm and tingling from her fingertips to her wrist. [*Id.*] She had no sensory loss or persisting weakness but reported variable weakness in her hands. [*Id.*] She reported a "2+ year history of symptoms affecting the right more than the left." [*Id.*] Dr. Lilly's assessments of Plaintiff included carpal tunnel syndrome, for which "surgical intervention will be scheduled at the next available opening." [*Id.*] The next day, Plaintiff underwent right carpal tunnel release surgery. [AR 801]

Plaintiff presented to Parkview on March 11, 2015, for her first post-operation ("post-op") visit. [*Id.*] She showed resolution of the radiating pain into her arm and hand, was gaining more strength, and was continuing the recommended strengthening exercises. [*Id.*] Plaintiff was "quite pleased" with the surgical outcome. [*Id.*] The provider's assessment was that Plaintiff "has great strength and finger opposition. Patient has resolution of her symptoms." [*Id.*] The provider further noted that Plaintiff was to undergo surgical intervention for carpal tunnel on her left side in April and that a preoperative appointment would occur the following month. [*Id.*]

On April 15, 2015, Plaintiff presented to Parkview for a pre-operation examination to clear Plaintiff for surgery on her left wrist for her carpal tunnel syndrome. [AR 798] At that time, she showed resolution of the pain radiating into her arm and hand and was gaining strength from the recommended hand strengthening exercises. [*Id.*] On April 21, 2015, Plaintiff had left carpal tunnel release surgery with Dr. Lilly. [AR 798] She presented to Dr. Lilly at Parkview on June 19, 2015, for her first post-op visit. [AR 796] Plaintiff's hand was still very tender at that time

and she complained of "a lot of weakness." [*Id.*] She stated she would experience sudden loss of grip and drop things and that she had pain, but it had improved. [*Id.*] She was referred for occupational therapy. [*Id.*]

On April 27, 2016, Plaintiff presented to Charles Hanson, M.D., at the Hanson Clinic for bilateral shoulder pain. [AR 982] Dr. Hanson noted examinations of Plaintiff's forearms and wrists were "unremarkable" and that there was no tenderness in either of her hands. [AR 985] On September 15, 2016, Plaintiff returned to the Hanson Clinic for bilateral elbow pain. [AR 977] She noted that when her elbows swelled, she noticed tingling in her elbow that extended into her hands. [*Id.*] She further stated that she had a history of left and right carpal tunnel syndrome, underwent surgical decompression in 2015, and recently became aware of gradual recurrence of pain and tingling in both hands. [*Id.*] After a physical examination, Dr. Hanson noted Plaintiff had "slight tenderness over the mid volar aspect" of both her wrists and forearms. [AR 980] There was no tenderness in either hand, and the joint and tendon functions of her fingers were normal. [AR 980]

B.    Plaintiff's Mental Health Records

The record indicates that on March 4, 2013, Plaintiff presented to the emergency department at Parkview, complaining of chronic psychiatric issues. [AR 772] She had no acute issues at that time and was "just wanting to get established with a psychiatrist and a primary care physician." [*Id.*] On March 6, 2013, Plaintiff presented to a primary care physician at Parkview for an appointment on her "mental issues." [AR 524] Plaintiff had been taking Depakote for her bipolar disorder but stopped the medication approximately one year prior due to the cost. [*Id.*] She stated that she could feel her symptoms returning and her depression getting worse, and that

she wanted to resume the medication for her bipolar disorder. [*Id*.] She was directed to keep her upcoming appointment with a counselor for her symptoms. [AR 525]

On March 19, 2013, Plaintiff presented to Spanish Peaks Behavioral Health Center ("Spanish Peaks") for an assessment and clinical intake on referral from her primary care physician. [AR 554, 582] On the initial assessment form, Plaintiff stated that "[l]ately I've been waking up with rages and I deal with that every day. I'm fine one minute then go off the next. I see things. I start seeing the flashbacks and then I start yelling." [AR 547] She continued that "[i]t creates problems when I work. I scream at the flashbacks. If I get upset at work, I go off on people, especially any kind of authority figure." [*Id*.] Plaintiff reported that when she was twelve, she was admitted to a psychiatric hospital for a month and a half because she had a "kiddie meltdown." [AR 549] Mindy Armijo, MA, diagnosed Plaintiff with "Bipolar I Disorder, Most Recent Episode Mixed, Severe With Psychotic Features," which she found appropriate because of the presence of recurrent major, depressive episodes, manic episodes with a history of duration more than seven days, and frequent auditory and visual hallucinations. [AR 552] Ms. Armijo also included a provisional diagnosis of PTSD and noted Plaintiff's history of being diagnosed with "ADHD." [*Id*.] She recommended Plaintiff undergo therapy and a psychiatric medication assessment. [AR 553] On March 26, 2013, Plaintiff presented to Spanish Peaks for a psychiatric evaluation. [AR 578-81] The diagnostic impression of Jon Westcot, D.O., was "bipolar NOS," PTSD, and possible panic disorder. [AR 580]

Plaintiff received various services from Spanish Peaks between March 19, 2013 and October 3, 2013, including at least nine other individual therapy sessions [AR 581, 577-78, 576-

77, 575, 574, 566, 565, 561-62, and 584], three group therapy sessions [AR 572-73, 566-67, and 559], and five medication management appointments [AR570-71, 568, 563, 560, and 586].

At a psychiatric medication management appointment on May 15, 2013, Plaintiff noted she could not concentrate, "wants to hurt people," and had intrusive thoughts that were getting worse. [AR 570-71] At another psychiatric medication management appointment on May 29, 2013, Plaintiff had "a little problem with the rage but definitely improvement." [AR 568] Plaintiff presented to Ms. Armijo for an individual therapy appointment on June 5, 2013 to address some of Plaintiff's traumatic memories from her time confined at a psychiatric hospital at age twelve. [AR 566] Plaintiff stated she needed the session after she had learned the facility was being publicly investigated for unsafe practices and malpractice. [*Id.*] On June 10, 2013, Ms. Armijo noted that vocational rehabilitation testing indicated it would be difficult for Plaintiff to obtain a general education degree ("GED") or a job at that time. [AR 565] She submitted a referral for anger management classes for Plaintiff. [*Id.*] On June 12, 2013, Plaintiff presented for another medication management appointment at which she reported that her medication was not working, her rage was getting worse, she could not concentrate, and her depression was "kicking in." [AR 563] Two weeks later, at another psychiatric medication management follow up appointment on June 26, 2013, the practitioner noted that Plaintiff's bipolar and PTSD had improved. [AR 560] On August 30, 2013, Plaintiff had her last medication management appointment at Spanish Peaks. [AR 586] She reported that she was not doing well overall but that she had been off her medications for about a month because she lost Medicaid and was getting angry again. [*Id.*] The doctor restarted Plaintiff on all of her prior medications and encouraged her to continue psychotherapy with Ms. Armijo. [AR 588] A week later Plaintiff attended what was her last

therapy session at Spanish Peaks on September 6, 2013. [AR 584] Ms. Armijo noted Plaintiff "[h]as not been seen in some time. Things are going pretty well." [*Id.*]

Plaintiff was discharged from the services at Spanish Peaks on October 3, 2013 because she missed two appointments within forty-five days. [AR 583] Her primary diagnosis at discharge was bipolar disorder, with a secondary diagnosis of PTSD. [*Id.*]

On June 10, 2013, Plaintiff underwent a psychological evaluation by David Benson, Ph.D., on referral from her attorney to assist in her application for social security benefits. [AR 777-85] Dr. Benson interviewed Plaintiff, administered various tests, and reviewed her records. [AR 780] He determined that Plaintiff "has numerous problems, including cognitive deficits, mood-related problems, and underlying anxiety-based issues," all of which appeared to be related to PTSD. [AR 782] He diagnosed Plaintiff with bipolar disorder type I, PTSD, borderline intellectual functioning, and avoidant personality traits. [AR 784] He further noted that she had trouble with anger and that her problems "will create various barriers to successful employment." [AR 782] Dr. Benson concluded that "[d]espite her problems, it seems in [Plaintiff]'s best interest to participate in the work world, if possible." [AR 785]

State agency psychological consultant Douglas Hanze, Ph.D., performed a mental residual functional capacity assessment of Plaintiff on November 21, 2013. [AR 123-25] He determined Plaintiff could follow simple instructions, sustain ordinary routines, and make simple work-related decisions. [AR 125] He further determined that she could not work closely with supervisors or coworkers but could accept supervision or work with coworkers if the contact was not frequent or prolonged. [*Id.*] Lastly, he noted her symptoms may cause a reduction in pace. [*Id.*]

On January 1, 2014, Plaintiff presented to Aspen Pointe for a clinical assessment. [AR 657] She reported she had "a very bad rage issue," and that she recently spent twenty-four hours in jail because of reports of a recent instance of child abuse. [*Id.*] She could not recall a time in her life when anger was not an issue and she had been through anger management classes four times and found them unhelpful. [*Id.*] Plaintiff also reported "visual hallucinations" all day that she believed were more like intrusive thoughts or flashbacks; when they occurred, she reacted by screaming. [*Id.*] Plaintiff also said she did not trust her therapists and that "they have all lied" to her. [AR 659] Plaintiff was diagnosed with PTSD. [AR 667] She began her treatment plan at Aspen Pointe on February 3, 2014. [AR 664]

On April 21, 2014, Plaintiff presented to Aspen Pointe's Psychopharmacological Clinic. [AR 6670] Plaintiff reported she was recently divorced, feeling anxious and panicky, heard voices or saw things when she had flashbacks, and felt paranoid around strangers. [*Id.*] She told the clinician that she graduated from high school, made honor role, and was accepted to college, but did not go because she was s single parent. [AR 671] Plaintiff was diagnosed with PTSD; bipolar disorder was not included in her diagnosis. [AR 672]

On September 15, 2014, Plaintiff underwent a level of care evaluation at Aspen Pointe. [AR 663] The results included that Plaintiff was "troubled in most significant relationships, but maintains control of any impulsive, aggressive, or abusive behaviors," and has "ongoing and/or variably severe deficits in interpersonal relationships . . . and ability to maintain responsibility." [*Id.*] While "[r]ecent gains and/or stabilization in function had been achieved," "[p]revious or current treatment has not achieved completed remission of symptoms or optimal control of symptoms." [*Id.*]

On November 1, 2014, Plaintiff presented to Aspen Pointe. [AR 654] The practitioner noted that Plaintiff "continues to struggle with heightened anxiety" and "has more control over her moods." [*Id.*] At that time, Plaintiff had returned to work and recently had gotten engaged. [AR 655] She presented for fifteen individual therapy sessions at Aspen Pointe between November 3, 2014 and June 27, 2016. [AR 873, 874-75, 877, 878, 879, 880, 883, 885, 900, 916, 926, 935, 946, 948, 950, and 960]

Plaintiff underwent a psychological evaluation by Richard Madsen, Ph.D., on March 2, 2015, on referral from her attorney to assist in her application for social security benefits. [AR 787-93] Dr. Madsen conducted a diagnostic interview and a mental status exam. [AR 787] Dr. Madsen concluded that Plaintiff had "classic symptoms of PTSD" from abuse suffered as a child and an adult, "a bipolar disorder with mood swings," "a history of impulsive behavior," a "learning disability," and "difficulty trusting people and relating to authority figures." [AR 790] He further concluded that "all of these things will interfere significantly with her ability to work." [*Id.*]

On March 27, 2015, Plaintiff presented to the crisis unit at Aspen Pointe complaining that she had "been out of control for days now" and that no one had been helping her. [AR 857] On May 1, 2015, Plaintiff presented for a comprehensive update at Aspen Pointe. [AR 862] She reported anger issues—including yelling screaming, and physical violence—and anxiety. [*Id.*] On May 23, 2015, she reported that she was able to utilize coping skills to manage her symptoms but was still experiencing anxiety. [AR 865] On June 19, 2015, Plaintiff presented for a medication management appointment at Aspen Pointe. [AR 888] At that time, she was taking no medication. [AR 889] Plaintiff was diagnosed with PTSD and was prescribed Depakote. [AR 891] Her

medication was periodically adjusted [*see, e.g.,* AR 914, 924, and 933], and Depakote was halted on June 27, 2016, but her other medications were continued. [AR 958]

## III.    Hearing Testimony

On March 19, 2015, Plaintiff, represented by counsel, and a VE testified before an ALJ at a hearing on Plaintiff's DIB and SSI benefits applications. [AR 78-111]

Plaintiff testified she last worked for Global Call Center and had quit that job in November 2014 because of what was going on with her mental health and her hands; since quitting, her parents took care of her; she had a nine-year-old son and a three-year-old daughter; she received support for one child; she had custody of her daughter and physical custody of her son, but shared all other types of custody of her son with her ex-husband; her son spent two months a year with his father; she "did everything" for her children, including feeding them, washing the dishes, doing the laundry, ensuring they got to school, and assisting with homework when she could; she went to "group"; there was a dog and two guinea pigs in the house she lived in and she participated in their care; she also took care of her mother, stepfather, and younger brother, who was twelve years old; she had a driver's license and drove a Civic Hybrid; she had not been kept overnight in a hospital or mental health facility for mental health reasons since she was a child when she spent a month and a half at an inpatient mental health facility; she had been in jail three times but not for more than twenty-four hours each time; she was convicted of driving under suspension, criminal domestic violence, and misdemeanor child abuse; the child involved in her misdemeanor was her son and she felt it was a result of her mental health; she had trouble interacting with other members of her family, including her new husband, and with her doctors; she was seeing a therapist once every two or three weeks and was looking for a psychiatrist accepting new patients; when she was

13

on mental health medication she felt and could concentrate better, but she still had problems interacting with others; she believed she was disabled primarily because of her mental health, as opposed to her carpal tunnel syndrome or shoulder pain; she had trouble understanding and remembering and had trouble participating in interviews "because of the people"; she had used public transportation and shopped for groceries for the household; she earned her GED in 2014 after taking classes at the public community college; she wanted to take other classes but the college could not offer her the accommodations she believed she needed, like one-on-one learning and more time in the classroom; she walked in the park and played in the grass with her children; and, she liked to read. [AR 84-96]

The ALJ then turned to the VE, Gretchen Bakkenson, who testified that an individual with Plaintiff's age, education, and vocational background and the following limitations –

> This individual is capable of light exertion, never climbing . . . ladders, ropes or scaffolds, never kneeling and never crawling, frequent ramps and stairs, frequent stooping and . . . crouching [] only occasional . . . reaching above the shoulder on the right side is limited to occasional.

> The individual is capable of no contact with the public, occasional contact with coworkers and supervisors. The individual is able to understand and remember and carry out simple instructions but would be unable to perform work requiring directing others, abstract thought or planning.

> The individual . . . is capable of a low stress job, which is defined as decision making, changes in work setting and judgment on an occasional basis commensurate with an SVP 2 at the most []. And the individual's capable of goal[-]oriented work at a flexible pace rather than above average production standards.

– could not perform Plaintiff's past jobs but could perform the jobs of "housekeeper," "photocopy machine operator," and "mailroom clerk." [AR 100, 105-08] The VE also testified that it would not be consistent with competitive work if the same individual were to be absent, tardy, or depart early by two hours three times per month. [AR 108-09]

14

The ALJ issued an unfavorable decision on April 22, 2015. [AR 146-163] Plaintiff appealed the decision and the SSA Appeals Council remanded the case to the ALJ on July 12, 2016. [AR 166-168] The ALJ held a subsequent hearing on February 7, 2017 at which the Plaintiff, represented by counsel, and a VE testified. [AR 44-77]

Plaintiff testified she gave physical custody of her son back to his father, but he still came to visit; her daughter, born in 2011, still lived with her; she felt like she could not work because she had "a lot of trouble understanding" and "they don't take the time to help [her] out"; she enjoyed talking with people on the phone at her previous call center job; she would like to work with animals if she could do anything for work; she had a twelve-pound chihuahua for about two years and posted videos of him on social media; she went to the animal shelter just for fun, to pet and see the animals there; she and her husband had their own home and no longer lived with her parents; she was still experiencing problems with her low back, both knees, right shoulder, and right elbow; she had surgery for her carpal tunnel syndrome that helped for a while, but the pain in her hands and wrists had come back; massaging or medicine made the pain better temporarily; she did not drive much because of issues with her grip strength; she dropped things; and, she was attending therapy but still had problems with her mental health. [AR 47-68]

The ALJ then turned to the VE, Martin Rauer, who testified that an individual with Plaintiff's age, education, and vocational experience and the following limitations –

[T]his hypothetical person were able to only occasionally lift and/or carry up to 40 pounds, could frequently lift and/or carry up to 20 pounds, can stand and/or walk for six to eight hours in a work day, can sit for about eight hours in a work day, can frequently engage in all postural activities and can frequently reach, handle, finger, push and pull with the bilateral upper extremities, and

this hypothetical person can understand and remember simple, routine tasks which can be learned and mastered with a brief demonstration within a 30[-]day period

15

and can sustain concentration, persistence and pace for these instructions over an eight[-]hour workday and 40[-]hour work week.

This person should only have occasional interaction with the general public and the coworkers, but could tolerate supervision, can tolerate routine task changes, can plan and set simple goals and can travel, recognize and avoid work hazards.

– could not perform the Plaintiff's past jobs but could perform the jobs of "small product assembler," "cafeteria attendant," and "machine operator"; if the limitations were further restricted to "only able to occasionally handle and finger with a dominant right upper extremity," but the rest of the limitations remained the same, the limitations would exclude all three of these positions. [AR 72-73] The hypothetical individual with the additional handling limitation could perform the jobs of "construction flagger," "courier," and "dealer, accounts investigator." [AR 73-74]

The ALJ issued an unfavorable decision on May 3, 2017. [AR 11-43]

## LEGAL STANDARDS

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA. 42 U.S.C. §§ 416(i), 423, 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant requirements. *See* 42 U.S.C. § 1382.

## I.     SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. § 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. § 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. § 416.920(g).

## II.     Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287

F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)). However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Hamlin*, 365 F.3d at 1214 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of her disability, December 8, 2012 (Step One). [AR 16] Further, the ALJ determined that Plaintiff had the following severe impairments: post-traumatic stress disorder; mood disorder; bilateral carpal tunnel syndrome, status post release surgeries; and obesity (Step Two). [AR 17] Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 18]

18

The ALJ then determined that Plaintiff had the RFC to

lift and/or carry 40 pounds occasionally and 20 pounds frequently while also able to stand and/or walk 6 to 8 hours and sit 8 hours in an 8-hour workday. In addition, the claimant is able to only frequently perform all postural activities and is able to only frequently push, pull, reach, handle, and finger with the bilateral upper extremities. Further, she is able to understand and remember only simple, routine tasks that can be learned and mastered with a brief demonstration within a 30-day period and can sustain concentration, persistence, and pace for these tasks over an 8-hour workday and 40-hour workweek. She should have only occasional interaction with the general public and co-workers, but she can tolerate supervision and routine task changes, she can plan and set simple goals, she can travel, and she can recognize and avoid work hazards.

[AR 19-20] The ALJ found "[a]fter careful consideration of the evidence, . . . that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [AR 21]

The ALJ then found the Plaintiff was unable to perform any of her past relevant work (Step Four). [AR 36] The ALJ proceeded to determine that, considering the Plaintiff's age, education, work experience, and residual functional capacity, there were jobs in the national economy that Plaintiff could perform, such as "small product assembler," "cafeteria attendant," and "machine operator." [AR 37] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [*Id.*]

Plaintiff sought review of the ALJ's decision by the Appeals Council on July 6, 2017. [AR 304-07] On August 27, 2018, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final

decision of the Commissioner of Social Security."  [AR 1]  Plaintiff timely filed her Complaint in this matter on October 24, 2018.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ gave substantial weight to Dr. Hanze's opinion but, without explanation, failed to follow all of his limitations; (2) the ALJ did not properly assess Plaintiff's limitations related to her carpal tunnel syndrome; and (3) the ALJ did not have valid reasons for assigning more weight to Dr. Francavilla-Brown's opinion than she assigned to Dr. Hrabal's opinion.

## ANALYSIS

The Court will address each of the Plaintiff's issues in turn.

**I.**    **The ALJ Gave Substantial Weight to Dr. Hanze's Opinion but Inexplicably Failed to Follow All of His Limitations**

Plaintiff first argues that although the ALJ gave "more weight" to the assessment of state agency psychological consultant Douglas Hanze, Ph.D., she did not properly account for his opinions on Plaintiff's tolerance for supervision and ability to maintain pace in her RFC determination.  Plaintiff continues that the ALJ must explain any difference between her RFC finding and Dr. Hanze's opinion and that "[i]t was error for the ALJ to fail to heed all of Dr. Hanze's restrictions, without expressing a reason, considering that she gave his opinion significant weight."  Pl.'s Opening Br. 6, ECF 15.

Dr. Hanze provided a mental RFC assessment of Plaintiff on November 21, 2013.  [AR 125]  He opined that Plaintiff

can follow simple instructions, sustain ordinary routines, and make simple work related decisions. [She] cannot work closely with supervisors or coworkers, although [she] can accept supervision and relate to coworkers if contact is not frequent or prolonged. [Symptoms] may cause some reduction in pace.

[AR 125] Elsewhere in the same form, Dr. Hanze indicated Plaintiff's "ability to accept instruction and respond appropriately to criticism from supervisors" is "moderately limited," and her "ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" is also "moderately limited." [AR 124-25]

The ALJ discussed Dr. Hanze's opinion in two paragraphs of her opinion. [AR 35] In addition to including Dr. Hanze's opinion quoted above, she acknowledged that he determined Plaintiff's conditions result in "up to moderate impairment in social functioning and . . . pace, such that corresponding workplace limitations are appropriate." [*Id.*] She continued that Dr. Hanze's assessment is "more persuasive because it is generally supported by the record as a whole."[1] [*Id.*] The ALJ concluded by stating, "Dr. Hanze's assessment is assigned *more weight* and residual functioning capacity limitations for unskilled work that involves limited contact with others is deemed adequate." [*Id.* (emphasis added)]

While the ALJ found Dr. Hanze's opinion "more persuasive" and assigned it "more weight," she did not incorporate all of his opinions in her RFC determination. The RFC limitations include, in relevant part, that Plaintiff "can sustain . . . pace for these tasks over an 8-hour workday

---

[1] The Court presumes this to mean more persuasive than the assessments from David Benson and Richard Madsen, which the ALJ had discussed for the six pages prior to her mention of Dr. Hanze's assessment.

and 40-hour workweek," and while "[s]he should have only occasional interaction with the general public and co-workers, [] she can tolerate supervision." [AR 19]

Defendant argues that Plaintiff does not challenge the ALJ's reasons for weighing Dr. Hanze's opinion as she did and only makes the "technical argument" that remand is warranted because the ALJ gave weight to Dr. Hanze's opinion without expressly adopting or discounting his statements regarding supervision and pace. Def.'s Resp. Br. 14, ECF 16. Although Plaintiff does not explicitly challenge how the ALJ weighed Dr. Hanze's opinion, it is evident that there is a dispute as to how much weight she assigned to it. Plaintiff contends the ALJ assigned the opinion "substantial weight," *e.g.,* Pl.'s Opening Br. 3, whereas Defendant states that the ALJ "found it more persuasive and gave it more (but not full) weight," Resp. 14. While she assigned it "more weight" than Dr. Benson's assessment—which she assigned "only partial weight" [AR 31]—and Dr. Madsen's assessment—which she assigned "just little weight" [AR 33]—it is impossible to infer how much weight she actually gave the opinion.

"An ALJ must evaluate every medical opinion in the record." *Hamlin,* 365 F.3d at 1215; *see also* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). Furthermore, "[f]indings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence," and "[a]dministrative law judges . . . may not ignore these opinions and must explain the weight given to these opinions in their decisions." SSR 96–6P, 1996 WL 374180, at *1 (July 2, 1996).

An ALJ's failure to weigh a medical opinion may be deemed harmless error if the opinion is "generally consistent" with the RFC determination. *Keyes-Zachary v. Astrue,* 695 F.3d 1156,

1163 (10th Cir. 2012). However, "this court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue,* 482 F.3d 1205, 1207-08 (10th Cir. 2007); *see also Krauser v. Astrue,* 638 F.3d 1324, 1331 (10th Cir.2011) ("[T]he ALJ's findings must be sufficiently specific to make clear to any subsequent reviewers the weight he gave to the treating source's medical opinion and the reason for that weight." (internal quotation marks omitted)).

In this case, the RFC determination is not consistent with Dr. Hanze's assessment. Dr. Hanze determined that Plaintiff "cannot work closely with supervisors" and "can accept supervision . . . if contact is not frequent or prolonged." [AR 125] He also indicated that Plaintiff's "ability to accept instruction and respond appropriately to criticism from supervisors" is "moderately limited." [AR 124] The RFC determination, however, does not include any qualifications or limitations on Plaintiff's interaction with supervisors, and instead includes that "she can tolerate supervision." [AR 19] Dr. Hanze also determined that Plaintiff's "[symptoms] may cause some reduction in pace" and her "ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" is "moderately limited." [AR 124-25] But, the RFC determination includes that Plaintiff "can sustain . . . pace for these tasks over an 8-hour workday and 40-hour workweek." [AR 19] Although the ALJ states that Dr. Hanze's assessment supports her RFC determination, there are clear discrepancies between them.

In addition to the lack of clarity regarding the weight assigned to Dr. Hanze's opinion, the ALJ failed to explain why she accepted some of his limitations and not others. This failure was in error. *See Haga*, 482 F.3d at 1208 ("We therefore agree that the ALJ should have explained why

23

he rejected four of the moderate restrictions on Dr. Rawlings' RFC assessment while appearing to adopt the others. An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."); *Wilson v. Colvin*, 541 F. App'x 869, 873 (10th Cir. 2013) ("As in this case, the ALJ in *Haga* did not expressly reject a medical opinion, but he did not include in the claimant's RFC all of the moderate restrictions stated in it. . . We reverse and remand to the ALJ for further consideration." (internal quotations omitted)); *Hays v. Colvin*, 630 F. App'x 749, 753 (10th Cir. 2015) ("Here, the ALJ mentioned Dr. Amin's report only in connection with [the plaintiff]'s upper right extremity, with no discussion of the weight being given to it. The ALJ did not even mention or weigh Dr. Amin's report as it related to her knee or her ability to stand and walk. Since the report as it relates to [the plaintiff]'s ability to stand and walk is consistent with neither the ALJ's RFC determination nor the hypothetical posed to the vocational expert in formulating the determination, the failure to consider and weigh it was error."); *Martinez v. Astrue*, 422 F. App'x 719, 724 (10th Cir. 2011) ("The error lies not in how the ALJ weighed Dr. LaGrand's opinion, but in his failure to include all of the limitations found by Dr. LaGrand without explaining why he rejected them, especially in light of his conclusion that her opinion was entitled to 'great weight.'").

Defendant also argues that even if the ALJ should have included additional limitations in the RFC to reflect Dr. Hanze's statements, such an error was not harmful because the jobs the ALJ determined Plaintiff could perform "*do not appear* to specify any unusual need to keep pace or have particularly involved interactions with supervisors." Resp. at 15-16 (emphasis added). Plaintiff replies that an individual in those jobs is still subject to supervision and it is obvious all jobs require a worker to work at a productive pace. Pl.'s Reply Br. 2-3, ECF 18. She continues

that considering those limitations in combination with her other restrictions "may erode" the jobs the ALJ relied on. *Id.* at 3. The Court agrees with Plaintiff. "Work-related mental activities generally required by competitive, remunerative work include the ability[y] to . . . respond appropriately to supervision." SSR 96-8P, 1996 WL 374184 at *6 (July 2, 1996). It is possible that including additional restrictions in terms of supervision and/or pace in Plaintiff's RFC, if appropriate, could further her claim of disability. *Cf. Keyes-Zachary*, 695 F.3d at 1163 ("There is no reason to believe that a further analysis or weighing of this opinion could advance [the plaintiff]'s claim of disability. The alleged error is harmless.").

The Court finds that the RFC determination as stated in the ALJ's decision is not consistent with Dr. Hanze's opinion. The ALJ's failure to weigh that opinion and explain why she accepted some, but not all, of its moderate restrictions, was not harmless error. *See Haga,* 482 F.3d at 1208; *Keyes–Zachary,* 695 F.3d at 1162–63. The Court reverses and remands to the ALJ for further consideration of Dr. Hanze's opinion. If the ALJ intended to omit the doctor's moderate restrictions regarding Plaintiff's ability to tolerate supervision or maintain pace from Plaintiff's RFC, the ALJ should explain her reasons for doing so, as well as the weight she assigns to the opinion. If the ALJ intended to adopt these moderate restrictions she should revise Plaintiff's RFC to include them.

## II.     Remaining Issues

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal." *See Cross v. Colvin*, 25 F. Supp. 3d 1345, 1348 n.1 (D. Colo. 2014). The Court expresses no opinion as to the Plaintiff's remaining arguments, and neither party should take the Court's silence as implied approval or disapproval of the arguments. *See Watkins*, 350 F.3d at

1299 ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand.").  The Court also does not suggest a result that should be reached on remand; rather, the Court encourages the parties, the ALJ, and the Commissioner on remand to consider fully and anew the evidence and all issues raised.  *See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the case].  Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citation and quotation marks omitted).

## CONCLUSION

In sum, the Court concludes that the ALJ failed to explain the weight she assigned to the assessment of state agency psychological consultant Douglas Hanze or explain why she adopted only some of his moderate limitations and not others.  Therefore, the decision of the ALJ that Plaintiff Shanna E. Wallen, was not disabled since December 8, 2012 is REVERSED AND REMANDED to the Commissioner for further consideration in accordance with this order.

Dated at Denver, Colorado this 31st day of March, 2019.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge